## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | Misc. No. 1:06-MC-00169(RBW) |
| I. LEWIS LIBBY, | ) | |
| | ) | |
| Defendant. | ) | |

### THE NEW YORK TIMES' REPLY TO DEFENDANT I. LEWIS LIBBY'S
### RESPONSE TO MOTION OF THE NEW YORK TIMES
### TO QUASH LIBBY'S RULE 17(c) SUBPOENA

The New York Times Company submits this Reply to Defendant I. Lewis Libby's

("Libby") Consolidated Response to Motions to Quash ("Libby Resp.").

**I.     Neither the Legal Authority Nor The Factual Proffer Contained In
        Libby's Response Supports Enforcement Of His Rule 17(c) Subpoena**

Libby's Response seeks to create the impression that *The New York Times* is urging

application of a test for enforcement of Fed. R. Crim. P. 17(c) ("Rule 17(c)") subpoenas that is

more stringent than the standard established in *United States v. Nixon*, 418 U.S. 683 (1974).

Actually, it is Libby who suggests that the *Nixon* criteria for enforcement of a Rule 17(c)

subpoena -- relevance, admissibility, and specificity -- should be disregarded in this case.  No

doubt Libby hopes to avoid application of *Nixon*'s requirements because, as revealed by his own

proffer of the circumstances supposedly supporting the admissibility of the subpoenaed

documents, it is now apparent that Libby has no plausible theory of relevance, much less

admissibility, for most of the documents he seeks.  And, Libby's Response also fails to rebut the

authority cited in *The New York Times*' Motion to Quash Libby's Rule 17(c) Subpoena, and

Supporting Memorandum of Law ("*New York Times*' Memorandum") showing that *in camera*

review is necessary to determine whether the few potentially admissible documents responsive to

the Libby Subpoena actually are admissible and should be disclosed.

A.    The Cases Relied Upon By Libby Do Not Support His Contention That His
      Subpoena Should Be Analyzed Under A Diluted *Nixon* Standard

Libby's Response begins by setting up the strawman argument that *The New York Times*'

Memorandum reads *Nixon* to require defendants to specify the "precise" content of documents

subpoenaed under Rule 17(c), and to establish "with certainty" that the document will be

admissible at trial.  Libby Resp. at 3.  The terms "precise" and "certainty" do not appear in *The*

*New York Times*' Memorandum, and we do not argue that *Nixon* erects such a formidable

standard.  Rather, we agree with those decisions that use a *probability* standard, i.e., whether it is

more likely than not a given document sought by a Rule 17(c) subpoena is relevant and

admissible in evidence.  *See, e.g.*, *United States v. La Rouche Campaign*, 841 F.2d 1176, 1180

(1st Cir. 1988) (affirming finding of *likelihood* that outtakes would reveal inconsistent statements

that would be admissible for impeachment); *United States v. Ball*, No. 99 – 20029-011-03, 1999

U.S. Dist. LEXIS 16417, at *6 (D. Kan.Aug. 9,  1999) ("[t]hat the requested material is

'potentially' relevant or admissible is not enough . . . .  There must be a 'sufficient likelihood'

that the requested material is 'relevant to the offenses charged in the indictment' . . . .").

Libby also complains that *The New York Times* misstates the *Nixon* requirements,

whereas he contends that cases he cites establish the true standard for enforcement of a Rule

17(c) subpoena issued to a news organization or reporter.  Libby Resp. at 4–9.  The decisions

cited by Libby do not support his position, however, in that these cases either: (1) involve

subpoenas for ordinary business records, rather than for newsgathering information entitled to

protection under the U.S. Constitution and the common law; (2) were decided prior to *Nixon*, or

otherwise did not involve the application of the *Nixon* criteria; or (3) actually support the

application of the *Nixon* criteria to trial subpoenas issued to news organizations in the very manner demonstrated by *The New York Times*' Memorandum, including the requirement for an *in camera* review of any relevant, specifically described records to determine if the records are admissible, and whether the defendant's need for the records outweighs the important constitutional and common law interests of the public and the press.

The overwhelming majority of the cases cited by Libby did not involve a subpoena issued to a news organization or a reporter, but rather dealt with attempts by defendants to obtain government records, non-news films, or ordinary business records from a third party. *See United States v. Brooks*, 966 F.2d 1500 (D.C. Cir. 1992) (police investigative report); *In re Grand Jury Subpoena*, 829 F.2d 1291, 1300 (4th Cir. 1987), *rev'd sub. nom. United States v. R. Enterprises, Inc.*, 498 U.S. 292, 299–300 (1991) (sexually explicit films); *United States v. Haldeman* 559 F.2d 31 (D.C. Cir. 1976) (government files); *Fryer v. United States*, 207 F.2d 134 (D.C. Cir. 1953) (witness'/defendant's statements); *United States v. Orena*, 883 F. Supp. 849 (E.D.N.Y. 1995) (surveillance reports/tax returns); *United States v. Jackson*, 155 F.R.D. 664 (D. Kan. 1994) (health and employment records), *United States v. Noriega*, 764 F. Supp. 1480 (S.D. Fla. 1991) (prison's recordings of conversations); *United States v. Poindexter*, 725 F. Supp. 13 (D.D.C. 1989) (government notes). Even Libby's authority recognizes that a higher level of scrutiny is required when a Rule 17(c) subpoena implicates constitutional concerns. *See, e.g., In re Grand Jury Subpoena*, 829 F.2d at 1300 ("even when the First Amendment . . . problems raised by subpoenas duces tecum do not, in and of themselves, rise to the level of constitutional violations, the concerns that underlie those constitutional provisions must enter into the balancing of interests that is required by a motion to quash under Fed. R. Crim. P. 17(c)"); *Haldeman*, 559 F.2d at 76 ("rules governing evidentiary discovery and production to be meticulously observed").

3

Several other cases cited by Libby pre-date *Nixon*, or otherwise do not apply the Nixon criteria at all. For example, Libby cites *United States v. Liddy*, 354 F. Supp. 208, 211 (D.D.C. 1972) extensively in support of his position, and even insinuates that it was decided "consistent with *Nixon*." Libby Resp. at 5. In fact, *Liddy* was decided two years prior to *Nixon* and, as explained below, its subsequent history in the District of Colombia Circuit casts even further doubt on its value as precedent on the point for which Libby cites it. Equally inapposite is the decision in *In re Grand Jury Subpoena*, which was reversed by the Supreme Court on the ground that it was error to apply the *Nixon* criteria to a grand jury subpoena. *R. Enterprises, Inc.*, 498 U.S. at 299–300 ("the *Nixon* standard does not apply in the context of grand jury proceedings.").

Third, a number of the cases cited by Libby are in fact supportive of the position set forth in *The New York Times*' Memorandum. For example, in *LaRouche*, the First Circuit carefully considered the First Amendment interests of news organizations implicated by Rule 17(c) subpoenas -- interests that Libby asserts do not exist, *see* Libby Resp. at 37 -- and endorsed *in camera* review to protect against unnecessary disclosure of protected materials. 841 F.2d at 1180–83. *Jackson*, another decision relied upon by Libby, states in no uncertain terms that "[i]t is not enough that the documents have some *potential* of relevance and evidentiary use." 155 F.R.D. at 667 (D. Kan. 1994); *see also id.* at 671 (requiring *in camera* review).[1]

---

[1] Other decisions cited by Libby are inconsistent with cases decided in this Circuit and, therefore, are entitled to no consideration. For example, *United States v. King* turned principally on its holding that reporters enjoy no First Amendment protection whatsoever from compelled production of newsgathering material in criminal cases. 194 F.R.D. 569 (E.D. Va. 2000). This reasoning is at odds with the District of Columbia Circuit's decision in *United States v. Ahn*, 231 F.3d 26, 37 (D.C.Cir. 2000) (recognizing reporters' qualified privilege); *see also United States v. Liddy*, 478 F.2d 586, 587 (D.C. Cir. 1972) (separate opinion of Leventhal, J.) (recognizing need for balancing of "First Amendment consideration of the importance to the newsman – and to the information of the public at large, through the press – of the content of [an] interview obtained under a pledge of confidentiality.").

In sum, Libby does not cite any convincing authority to support his position that some diluted version of the *Nixon* criteria are applicable to subpoenas issued to news organizations by defendants in criminal cases. And, as demonstrated in *The New York Times*' Memorandum and reinforced below, the Libby Subpoena simply fails the *Nixon* test. Five of the six document categories in the Libby Subpoena do not satisfy one or more of the three *Nixon* criteria, while an *in camera* review will be necessary to determine if the remaining category satisfies the *Nixon* admissibility requirement, and whether the defendant's need for the records outweighs the constitutional and common law interests implicated by the subpoena.

> **B.** **Libby Is Not Entitled To Immediate Production Of The Documents He Seeks In Category Three Of His Subpoena, And *In Camera* Review Is Necessary To Determine Whether Disclosure of These Documents Is Required At All**

Not surprisingly, Libby begins his discussion of the materials sought from *The New York Times* by addressing Category 3 of his Subpoena, the only one of the six categories that calls for documents having even *potential* evidentiary value. Category 3 of the Libby Subpoena seeks production of documents that refer to or describe specific conversations that Judith Miller had with Libby in June-July 2003. Libby already has received from the Special Prosecutor Ms. Miller's actual notes of these conversations, but Category 3 also encompasses references to the Miller-Libby conversations contained in transcripts of interviews of Ms. Miller conducted by other *New York Times* reporters in preparation for an article on the Miller case published on October 16, 2005.

In *The New York Times*' Memorandum, we demonstrated why *in camera* review is necessary for the relatively few interview transcript pages, and a draft of Ms. Miller's June 16, 2005 article, that are responsive to Category 3, if and when Ms. Miller has testified as a government witness, to determine whether Libby actually has a need for use of the statements as

impeachment material that outweighs the First Amendment interests and the common law

privilege. *Id.* at 24–27. However, Libby's Response fails to address in any substantive way the

cases cited by *The New York Times* in support of this *in camera* procedure. Indeed, Libby

virtually ignores the Third Circuit's decisions, on nearly identical facts, in *United States v.*

*Cuthbertson*, 630 F.2d 139, 144 (3rd. Cir. 1980) ("*Cuthbertson I*") and *United States v.*

*Cuthbertson*, 651 F.2d 189, 195 (3rd Cir. 1981) ("*Cuthbertson II*"); *see also LaRouche*

*Campaign*, 841 F.2d. at 1183 ("we can expect the district court *in camera* to balance the

competing constitutional interests, limiting disclosure of journalistic products to those cases

where their use would, in fact, be of significant utility to a criminal defendant"); *United States v.*

*Fields*, 663 F.2d 880, 881 (9th Cir. 1981).

Instead of addressing this persuasive authority that requires *in camera* review of

journalistic materials, Libby argues that these transcripts "almost certainly" constitute admissible

evidence and, in any event, he claims that his counsel is in a better position than the Court to

detect how particular material is relevant. Libby Resp. at 17.   Libby also suggests that giving

him access to the transcripts now will "avoid a dispute over such evidence [in] the middle of

trial." Libby Resp. at 16-17.   These arguments are plainly wrong.

First, Libby ignores the fact that he is unable to demonstrate an actual *need* for any

portion of the transcript or the draft article, as opposed to a mere desire to see what these

materials contain, until Miller has testified and the impeachment value of any portion can be

assessed. *Cuthbertson I*, 630 F.2d at 144 (citing *Nixon*); *LaRouche Campaign*, 841 F.2d at 1180

(for impeachment materials, "the admissibility prong of Rule 17(c) cannot be fully assessed until

the corresponding witness testifies at trial."). And, like the defendant in *Cuthbertson*, Libby has

not identified "any use of the present materials as evidence in the trial other than for purposes of impeachment. *Cuthbertson II*, 651 F.2d at 195..[2]

Second, Libby's expression of concern over potential delay occasioned by mid-trial *in camera* review fails to take account of the fact that experienced trial judges make evidentiary decisions in the middle of trial *every day*, often after reviewing material *in camera* and/or receiving argument from counsel out of the presence of the jury. Moreover, the quantity of material responsive to Category 3 is relatively modest, little more than a dozen pages. Libby's references to potential appellate proceedings, Libby Resp. at 9, 17, if intended to suggest another cause for delay, are insubstantial and unconvincing. *See, e.g., LaRouche Campaign*, 841 F.2d at 1183 (rejecting claim that serious mid-trial interruption could occur from *in camera* review and potential appellate proceedings).[3]

In dismissing the need for *in camera* review of the transcripts of the Miller interviews, Libby cites *United States v. Smith*, 135 F.3d 963 (5th Cir. 1998), *United States v. Cutler*, 6 F.3d

---

[2] Libby suggests that the rough notes of one of *The New York Times* reporters, who interviewed Ms. Miller for an October 16, 2005 article on the Miller case, would be admissible as a business record under Fed. R. Evid. 803(6), citing cases involving the notes of medical, financial, and court personnel. Libby Resp. at 16 n.4. These cases are readily distinguishable in that the notes at issue were prepared by professionals as the sole record of the events or conditions being observed. Thus, these professionals had the incentive to make the notes with a high level of care and accuracy so that the record could be referred back to and relied on when the professionals subsequently administered treatment, rendered advice or otherwise took actions in the performance of their duties. In contrast, the notes sought by Libby were taken by a reporter during an interview that was being recorded, and of which a transcript was to be made. In these circumstances, there is no reason to expect that the reporter took detailed and complete notes, with the intention of creating an accurate record for future reference, as opposed to making episodic notes as a short-hand guide for follow-up questions to be asked during the interview.

[3] Elsewhere, Libby insinuates that pre-trial disclosure of the requested information is necessary to avoid delay occasioned by transcription of tapes or review of voluminous material. Libby Resp. at 3, 4, 9 (citing *Nixon*). Here, the interviews are already transcribed, and there are only 14 transcript pages containing potentially responsive information. By comparison, in *Nixon*, the Special Prosecutor subpoenaed a variety of documents and sixty hours of taped conversations. *See* Nixon Whitehouse Tapes FAQs, http://nixon.archives.gov/faq/tapes.html (last visited May 3, 2006). In evident recognition of the volume of material requested, the Supreme Court ordered pre-trial production of the tapes, stating "the analysis and possible transcription of the tapes may take a significant period of time." *Nixon*, 418 U.S. at 702.

67 (2d Cir. 1993), and *Liddy*, 354 F. Supp. at 211. Libby Resp. at 16–17.    However, both *Smith*

and *Cutler* involved criminal defendants' efforts to obtain video and notes of their statements to

reporters made *contemporaneously* with the events underlying their criminal case. *Smith*, 135

F.3d at 972–73; *Cutler*, 6 F.3d at 73.    Here, only a portion of the interview transcripts at issue

recount statements made by Libby to Ms. Miller, and those interviews of Ms. Miller were

conducted *over two years after* the statements were actually made. Thus, there is a much more

substantial question in this case whether the Miller interview transcripts will have any

evidentiary value as impeachment material.

　　　　*United States v. Liddy* also involved actual tapes of statements made to the media, by an

unindicted co-conspirator and key government witness, but it is not so clear, as Libby's

Response insinuates, that the tapes were ordered produced to defendant pre-trial without any *in*

*camera* review.    Chief Judge Sirica's opinion clearly contemplated that the audio tapes would be

produced *in camera* and that "appropriate deletions" would be made to transcripts of the tapes

before being made available to defendants at or just prior to trial, in the exercise of the Court's

discretion. *Liddy*, 354 F. Supp. at 217 n.35. Moreover, on emergency application to the District

of Columbia Circuit for a stay, Judge Leventhal made clear that because

> pre-trial statements by a prospective witness 'ripen into evidentiary material
> for purposes of impeachment if and when, and only if and when, the witness
> who has made the statement takes the stand and testifies'. . . . [the transcripts]
> should . . . not be disclosed to counsel prior to completion of the direct testimony
> of [the witness and] until the trial judge has made inquiry of the possibility of
> less drastic means. . . .

*United States v. Liddy*, 478 F.2d at 587–88 (separate opinion of Leventhal, J.) (citations omitted).

Judge Leventhal's reasoning certainly should trump Libby's naked claim that his counsel, and

not the Court, can *now* determine that notes and transcripts of the Miller interviews are

admissible in his defense. Libby Resp. at 17.

In sum, Libby has failed to refute or distinguish the authority cited by *The New York Times* in support of its position that *in camera* review is required to ascertain whether the Category 3 materials have actual impeachment value and Libby's need for the materials outweighs *The New York Times'* First Amendment interest and common law privilege. Thus, the procedure proposed in *The New York Times'* Memorandum for the submission and *in camera* review of these materials should be followed. *Id.* at 26–27.

C.     Libby's Response Demonstrates There Is No Plausible Theory Of Admissibility For Documents Requested in Category 6 of His Subpoena

Libby next discusses Category 6 of his subpoena, which seeks documents reflecting communications between *New York Times* personnel, and eight enumerated individuals, "concerning former Ambassador Joseph Wilson prior to July 14, 2003." Libby's arguments regarding the application of the *Nixon* criteria to this category of documents make clear that he has no plausible theory of admissibility for most of the documents covered by this request and that, rather than being targeted and specific, Category 6 is a wide net in search of a catch.

Libby admits that not all of the eight individuals will be government witnesses; he predicts only that "several" will be. Libby Resp. at 17. The others "may be called by Mr. Libby himself," although the Court and *The New York Times* are left to speculate about which individuals may testify for the defense. *Id.*; *see also id.* at 21 ("other persons named in *Request 6* are also likely to be key witnesses, whether called by the prosecution or the defense."). Libby has articulated no theory of admissibility for *New York Times* records of communications with individuals to be called by the *defense*. At this time, Libby has only proffered that Ari Fleisher and Marc Grossman will be government witnesses. Libby Resp. at 19–21. Thus, the Libby Subpoena should be quashed insofar as it seeks records of communications with any of the other six individuals enumerated in Category 6.

In all events, Libby's rationale for the relevance and admissibility of the information called for by Category 6 of his subpoena does not survive even minimal scrutiny. Libby argues that such documents will "help to show that administration officials – employed by the CIA, the State Department, and the White House (including the OVP) – saw Ms. Wilson's employment as a point unworthy of mention in connection with the Wilson story." Libby Resp. at 18; *see also id.* at 19 n.5 ("evidence that [Assistant to the Vice President for Public Affairs Cathie] Martin did *not* relay that information [about Ms. Wilson] is relevant for the reasons given above."). In fact, *The New York Times* does not possess records of communications with any such "administration officials" concerning Joseph Wilson during the time period prescribed in Category 6. Even if it did possess these records, the rationale for admissibility offered by Libby is a dubious one -- whether other administration officials thought Valerie Plame's employment was unworthy of mention in the Wilson story says nothing at all about Libby's state of mind.

Thus, Category 6 of the Libby Subpoena should be quashed in its entirety.

D.     Libby's Response Falls Well Short of Demonstrating That Categories 1, 2, 4 And 5 Of His Subpoena Satisfy The *Nixon* requirements

The Libby Response has relatively little to say about Categories 1, 2, 4 and 5 of the Libby Subpoena. Regarding the first two categories, Libby argues that he may use the documents "to question Ms. Miller's New York Times colleagues about what they may have known about Ms. Wilson and whether they may have shared that information with Ms. Miller [prior to June 23, 2003]." Libby Resp. at 22. However, Libby has no basis for expecting that any other *New York Times* reporter will be called to testify for the government, and he has identified no non-impeachment theory of admissibility for other reporters' notes of conversations

with their sources.[4]  Certainly, Rule 17(c) does not permit a defendant to subpoena documents

for use to obtain leads to other documentary evidence or information.  *See, e.g., United States v.*

*Cutler*, 6 F.3d at 74 (quashing subpoena for reporters' notes of conversations with government

officials that defendant sought use to prove that statements violating court order came from

sources other than defendant); *United States v. Cherry*, 876 F. Supp. 547, 553 (S.D.N.Y. 1995)

(citing other cases).   In any event, *The New York Times* does not possess any records indicating

that its reporters, other than Judith Miller, talked to sources about Valerie Plame.

As for Ms. Miller, her first-person account of her grand jury appearance, published on

October 16, 2005, acknowledges that she *had* "discussed the Wilson-Plame connection with

other sources [but] could not recall any by name or when those conversations occurred."  *See*

Libby Resp., Exhibit D at 6.  Libby has not asserted, and he would have no basis for doing so,

that he needs the transcripts of interviews of other *New York Times* reporters, or drafts of the

October 16, 2005 articles, on the ground that those materials reflect contradictory statements

regarding whether Ms. Miller spoke to other sources about Ms. Plame.

Libby next argues that he needs documents responsive to Category 4 of his subpoena to

challenge Judith Miller's credibility by proving that there is a dispute between Ms. Miller and the

then *New York Times* Washington Bureau Chief, Jill Abramson, about whether Ms. Miller

recommended pursuit of a story about Joseph Wilson's trip to Niger.  Libby Resp. at 23–24.

According to *New York Times* articles appended to the Libby Response, Miller recalls that she

*did* request permission to pursue such a story, Libby Resp., Ex. D at 7, while Ms. Abramson says

---

[4] Libby contends that the New York Times is speculating about who will be called to testify as a
government witness.  Libby Resp. at 23.  If Libby has a basis for proffering that any *New York Times*
reporter, other than Judith Miller, may be called as government witness, it was incumbent upon him to
proffer that information in his Response.  Instead, it is Libby who speculates that other reporters might
possibly be called to testify by the government.

that Miller *did not*. Libby Resp., Ex. E at 5. Thus, Libby is already aware of the existence of a

dispute on this point and is in possession of documentary information that he can use to illustrate

or emphasize it. Libby has not asserted, and he would have no basis for doing so, that he needs

the transcripts of interviews of Ms. Miller or Ms. Abramson, or drafts of the October 16, 2005

articles, on the ground that those materials reflect contradictory information received from either

of them about this dispute.[5]

Finally, Libby argues that Category 5 of his Subpoena -- which seeks information

regarding a conversation recounted to *Vanity Fair* by Ms. Miller, in which she reportedly told

*New York Times* Assistant General Counsel George Freeman that she had spoken to many people

in government about Valerie Plame -- will be "powerful evidence" because it "may" identify the

government officials to whom Ms. Miller spoke about Plame. Libby Resp. at 24. Libby offers

speculation that some *New York Times* document reveals the identity of a government official,

other than Libby himself, with whom Ms. Miller discussed Valerie Plame. In fact, there is no

such record. As Miller has stated publicly in describing her grand jury testimony, she simply

cannot recall who else she had discussions with regarding Valerie Plame, or when those

discussions occurred. Libby Resp., Ex. D at 6. To the extent that the transcripts of interviews of

other *New York Times* reporters, or drafts of the October 16, 2005 articles, merely recount this

same statement by Ms. Miller, the materials have no evidentiary value whatsoever and, therefore,

a subpoena for such materials does not satisfy the *Nixon* admissibility requirement.

---

[5] In all events, the portions of the transcripts of Ms. Miller's interviews containing information responsive to this and other Subpoena categories will be submitted for *in camera* inspection by the Court, pursuant to the procedure proposed in *The New York Times'* Memorandum. *Id.* at 27. Should Libby's counsel cross-examine Ms. Miller about whether she recommended pursuit of a story about Joseph Wilson's trip to Niger, any statement in the interview transcripts on that subject at odds with her trial testimony would then be subject to production as impeachment material.

E.    Libby Apparently Has Conceded That His Subpoena Fails To Satisfy
      The *Nixon* Requirements With Respect To Transcripts Of Interviews
      Of Individuals, Other Than Judith Miller, Conducted In Preparation
      For The October 16, 2005 Article Regarding The Miller Case, Or For
      Drafts Of That Article

It should be recognized that, to the extent that the Libby Subpoena called for the

production of draft *New York Times* news articles, Libby seems to have abandoned his effort to

obtain these materials. Libby's extensive discussion of the basis for the various categories of his

Subpoena, Libby Resp. at 15–24, contains no explanation whatsoever as to how any request for

draft *New York Times* articles satisfies *Nixon's* relevancy, admissibility and specificity criteria.

Also conspicuously absent from the Libby Response is any justification for disclosure of

transcripts of interviews of *New York Times* personnel, other than Judith Miller, and of other

sources for information gathered for the October 16, 2005 article regarding the Miller case.

Those transcripts are responsive to Libby's Subpoena only insofar as they reflect recollections by

others of what Ms. Miller said, or understandings of others regarding what Ms. Miller did, in

June-July of 2003. Such second-hand accounts have no evidentiary value, a fact apparently

recognized by Libby given the absence of any argument to the contrary in his Response.

Significantly, Libby recounts at great length, and in exquisite detail, all of the information

he has obtained through public sources, and from the Special Prosecutor, casting doubt upon the

accuracy of Ms. Miller's recollection of certain matters. Libby Resp. at 11–15. And Libby also

will obtain even more information with potential impeachment value once the Special Prosecutor

turns over the grand jury testimony of Ms. Miller, Federal Bureau of Investigation reports of

Miller interviews, and any other Section 3500 material that may exist. Libby's possession or

access to this extensive collection of prior statements by Ms. Miller belies the notion that Libby

could demonstrate need for the hearsay accounts of other *New York Times* personnel, and of

sources, contained in the transcripts of interviews in preparation for the October 16, 2005 article.

## II.    The Procedure Proposed By The New York Times For In Camera Review Of The Few Responsive And Potentially Admissible Documents Is Fully Supported By The Case Decisions Of This Circuit And Other Courts

Libby contends that courts in this Circuit do not recognize any First Amendment interest,

or a common law privilege, that affords news organizations or reporters any protection from

Rule 17(c) trial subpoenas.  In doing so, Libby ignores both the thirty years of jurisprudence that

followed the Supreme Court's decision in *Branzburg v. Hayes,* 408 U.S. 665 (1972) and the clear

language of several of the cases on which he relies.  Libby also resorts to charging that *The New

York Times* is seeking to quash the subpoena in order to "deprive" him evidence relevant to his

innocence.  Libby Resp. at 38–39.  But this hyperbole cannot obscure the fact that most of the

information sought by the Libby Subpoena, rather than being exculpatory, is irrelevant and

inadmissible, and that rather than "depriving" Libby of information, *The New York Times*

proposes to submit the few potentially admissible documents responsive to Libby's request for *in

camera* review.  The legal authority identified in *The New York Times* Motion and supporting

Memorandum requires, through the mechanism of *in camera* review, a balancing of its important

constitutional and common law interests against Libby's constitutional right to a fair trial.

### A.    The Law Affords First Amendment Protection To News Organizations And Reporters Served With Rule 17(c) Subpoenas

Libby is simply incorrect in asserting that courts of this Circuit have interpreted

*Branzburg v. Hayes*, 408 U.S. 665 (1972) to hold that news organizations and reporters served

with a Rule 17(c) subpoena have no cognizable First Amendment interests.  To the contrary, this

Circuit has limited *Branzburg* to its facts in ruling that reporters have no First Amendment

protection to withhold evidence in response to a *grand jury* subpoena.  "While some would read

the absolute language of the Supreme Court as foreclosing the possibility of any [First Amendment privilege] under any circumstance, our court, among others, has limited the applicability of the *Branzburg* precedent to the circumstances considered by the court in *Branzburg* – that is, the context of a criminal proceeding, or even more specifically, a grand jury subpoena." *Wen Ho Lee v. Dep't of Justice*, 413 F.3d 53, 58 (2005). Both *Branzburg* and this Circuit's recent decision in *In re Grand Jury Subpoena, Judith Miller,* 438 F.3d 1138, 1141 (D.C. Cir. 2006), *modifying* 397 F.3d 964 (D.C. Cir. 2005), involved reporters who were considered eyewitnesses to crimes being investigated by the grand jury who attempted to quash subpoenas in order to protect confidential sources. *Miller* itself expressly recognized the limited reach of *Branzburg*: "the Supreme Court decided in *Branzburg* that there is no First Amendment privilege protecting journalists from appearing before the *grand jury* . . . , or otherwise providing evidence to a *grand jury*. . . ." *Miller*, 397 F.3d at 970 (emphasis supplied).

In contrast, in cases involving a defendant's issuance of a *trial* subpoena to a news organization or reporter, courts have consistently recognized that a First Amendment privilege survived *Branzburg*. As the multitude of cases cited in the *New York Times'* opening brief make clear, the courts of this Circuit and elsewhere routinely consider, with great care, the First Amendment implications of trial subpoenas issued to the media in criminal cases. *See, e.g., United States v. Ahn*, 231 F.3d 26, 37 (D.C. Cir. 2000); *United States v. LaRouche Campaign*, 841 F.2d at 1182; *United States v. Caporale,* 806 F.2d 1487 (11th Cir. 1986); *United States v. Burke,* 700 F.2d 70, 77–78 (2d Cir. 1983); *Cuthbertson II*, 651 F.2d at 195–96; *United States v. Pretzinger*, 542 F.2d 517 (9th Cir. 1976); *United States v. Hubbard*, 493 F. Supp. 202, 205 (D.D.C. 1979).

Libby attempts to distinguish *Ahn* and *Hubbard* on the ground that these cases involved defendants' issuance of subpoenas to news organizations in connection with plea and suppression proceedings, respectively, and not for production of evidence at trial. Libby Resp. at 40. Even as distinguished on this ground, these cases certainly do not support Libby's position that "a reporter's privilege can only apply in civil cases." *Id.* at 41. Moreover, Libby offers no principled reason why courts would recognize the need to weigh First Amendment interests of news organizations when their documents are subpoenaed for certain critical stages of criminal trial proceedings, such as those at issue in *Ahn* and *Hubbard*, but would find -- as Libby argues is the case -- that those First Amendment interests simply do not exist when a defendant seeks media material in preparation for trial.[6]

In counterpoint to the considerable persuasive authority cited by *The New York Times*, Libby offers only *United States v. Smith*, *United States v. Cutler*, and *In re Shain*, 978 F.2d 850 (4th Cir. 1992). For the reasons previously discussed, *see* above at 7, *Smith* and *Cutler* are readily distinguishable on their facts. And courts in the Fourth Circuit have interpreted *Shane* as using "both the language of privilege and protection," rather than extending to trial proceedings the *Branzburg* rejection of the reporters' privilege in the grand jury context. *See, e.g.*, *King*, 194 F.R.D. 569, 583–84 (E.D. Va. 2000); see also *Shane*, 978 F.2d at 854 (Wilkerson, J., concurring in the judgment) (requiring balancing of First Amendment interests and defendant's need for the information).

The very cases relied upon by Libby in his Response belie his position that the reporters' privilege does not exist for materials subpoenaed by a defendant to prepare for trial. For

---

[6] Libby also attempts to distinguish *Hubbard* on the ground that the court there concluded that the evidence subpoenaed was "hearsay," "merely cumulative," and "less than the best evidence available." *Id.* at 40. Yet, as demonstrated above, virtually all of the documents sought by Libby are likewise hearsay, cumulative and far from the best evidence. See discussion above at 9–12.

example, in *United States v. Liddy,* Chief Judge Sirica considered a challenge to a tailored

defense subpoena that sought only tape recordings of a newspaper's interview with a key

government witness. The confidential nature of the recordings was in some question because a

copy of it had actually been given by the newspaper to the witness himself. Still, Chief Judge

Sirica carefully considered the First Amendment implications of enforcing the subpoena and

adopted a procedure remarkably similar to the one proposed here by the *New York Times.*

Specifically, he directed the newspaper to produce the tape recording in chambers for preparation

of a stenographic transcript for the Court's review and possible redaction before disclosure to

defendant's counsel at trial. *Liddy,* 354 F. Supp. at 217 n.35. Moreover, as previously

mentioned, on appeal Judge Leventhal expressed the view that there should be *no* disclosure to

Liddy's counsel until *after* the government witness testified. *Liddy,* 478 F.2d at 588.

Libby also relies upon *LaRouche*, a case that involved facts quite different than those

present here. The defendant there subpoenaed film outtakes of a news interview of a government

witness who had been paid to provide the interview. *LaRouche Campaign*, 841 F.2d at 1177–78.

Some of the statements in the interview paralleled testimony given by the witness when he

testified for the government in a related prosecution. Despite the likelihood that information in

the outtakes had already been disclosed in the public record, the *LaRouche* court still found

necessary the "sensitive district court conduct of [an] *in camera* review[] to respond to the

generalized First Amendment concerns that would be triggered by too easy and routine a resort

to compelled disclosure of nonconfidential material." *Id.* at 1183.

Finally, Libby completely misreads Supreme Court authority on the issue of editorial

privilege . Contrary to Libby's assertion, Libby Resp. at 41, *Herbert v. Lando*, 441 U.S. 153

(1979) does not support the proposition that there is no editorial privilege in criminal

proceedings. The plaintiff in that defamation case was a public figure, and therefore plaintiff

was required to prove that the media defendants published defamatory material with actual

malice. The Supreme Court decided that, in these particular circumstances, defamation plaintiffs

could obtain through discovery editorial materials that might shed light on whether defendants

acted with actual malice. *Id.* at 176. *Lando* has never been interpreted in this Circuit to have

held that newsgathering entities have no editorial privilege at all when subpoenaed in criminal

cases. The only other case cited by Libby for this remarkable proposition, *Riley v. City of*

*Chester*, 612 F.2d 708 (3rd Cir. 1979) is not even a criminal case. In all events, as previously

discussed, Libby appears to have abandoned his effort to obtain the draft news articles which are

protected by *The New York Times* editorial privilege. *See* above at 12–13.

      B.     Libby's Suggestion That The Relief Requested By *The New York Times*
               Will Deprive Him Of Evidence Necessary To Prove His Innocence Is Hyperbole
               And Fails To Address Squarely The Reasonableness Of The Procedure Proposed
               To Balance The Competing Interests In this Case

     Despite Libby's insinuations to the contrary, *The New York Times*' motion to quash does

not seek to withhold eyewitness or any other kind of substantive evidence from the trier of fact.

All the verbiage in Libby's Response regarding the *New York Times'* attempt to use the

journalists' privilege to "trump" his right to a fair trial may well be intended to obscure the fact

that Libby *already has received* the few *New York Times*' records with any true evidentiary value

-- the contemporaneous notes of Judith Miller that recount statements Libby made to her in June-

July 2003 -- and that the Libby subpoena actually attempts to reach records of interviews and

drafts of an article prepared *over two years* after the events underlying the Indictment. Rather

than seeking to "deprive" Libby of evidence, Libby Resp. at 38–39, the *New York Times* asks

only that this Court accept *in camera* the limited materials sought by Libby's Subpoena that

arguably fall within the scope of Rule 17(c) to determine whether the material actually has

impeachment value and should be turned over to Libby's counsel following the trial testimony of the government witness to which the material relates.  As the cases cited by Libby himself make clear, this *in camera* review procedure routinely used by federal courts minimizes or eliminates the undeniable chilling effect such subpoenas have on those news gathering activities so important to this nation's free and vibrant press.

In short, Libby is plainly wrong in asserting that there is no First Amendment protection available in this Circuit for the unpublished material of news organizations and reporters subpoenaed by defendants in criminal case.  The *in camera* review process routinely used by courts in this Circuit and others provides a mechanism for assuring the proper balance between the well-established First Amendment interests of newsgatherers, and the constitutional rights of defendants.  Libby's response fails to offer any case authority or valid reasoning for his position that *in camera* review is not appropriate in these circumstances.

C.    Libby' Characterization Of The Common Law Reporters' Privilege
As "New" Ignores Well-Settled Statutory And Judicial Authority

Libby deals with *The New York Times*' discussion of the reporters' privilege grounded in the common law, *see New York Times*' Memorandum at 21–24, by pretending that privilege does not exist.  In arguing that the Court "should not recognize a new reporters' privilege,"  Libby Resp. at 41–42, Libby has chosen to ignore altogether Judge Tatel's exacting analysis of the issue in *In Re: Grand Jury Subpoena, Judith Miller*, 438 F.3d at 1164–72.  Libby's characterization of the privilege as non-existent simply cannot be squared with "'reason and experience,' as evidenced by the laws of forty-nine states and the District of Columbia, as well as federal courts and the federal government. . . ." *Id.* at 1172.

Perhaps recognizing that pretense regarding the existence of the reporter's privilege will not survive this Court's scrutiny, Libby returns to the familiar refrain that his interest in

"establishing his innocence" outweighs the public policy reasons that support recognition and protection of reporters' confidences. Libby Response at 42–44. Libby insists, as he does throughout his Response, that compelling reporters to disclose confidential information will "impose no undue burden on newsgathering" and that any resulting harm to newsgathering is merely "generalized." *Id.* at 43. These notions that little harm comes from compelling reporters to become witnesses and to divulge confidential information, and that news organizations like *The New York Times* should have rights no greater than any other corporate citizen when served with a subpoena, are simply Orwellian. Our courts have long-recognized that the rights of every citizen are intertwined with the preservation of a free press, and that a free press cannot function if its investigative and editorial work must be performed under circumstances where the media can be used by litigants and government investigators to achieve litigation goals. As this Circuit acknowledged in *Zerilli*,

> [t]he press was protected so that it could bare the secrets of government and inform the people. Without an unfettered press, citizens would be far less able to make informed political, social and economic choices. But the press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired.

*Zerilli*, 656 F.2d at 710–11.

In sum, the common law reporters' privilege is not new, and the interests that it protects are substantial. Libby's need for particular documents sought from *The New York Times* must be balanced against those interests on a document-by-document basis, and a generalized expression of a desire by Libby to "prove his innocence" should not be accepted as a substitute for demonstration of need on a particularized basis.

## CONCLUSION

For the foregoing reasons, the Court should quash or modify the subpoena issued to The New York Times Company.

Respectfully submitted,

/s/ Charles S. Leeper
Charles S. Leeper  (#310367)
Mary E. Kohart
DRINKER BIDDLE & REATH LLP
1500 K Street, N.W.
Suite 1100
Washington, D.C. 20005
Telephone:  (202) 842-8800
Facsimile:  (202) 842-8465

George Freeman
Assistant General Counsel
THE NEW YORK TIMES COMPANY
229 W. 43rd Street, 12th Floor
New York, NY 10036

**Attorneys for The New York Times Company**

May 8, 2006